petitioner. Ms. Skelton for the petitioner, Ms. Daring for the respondent. Good morning, counsel. Ms. Skelton, please proceed when you're ready. Good morning. May it please the court. We are here this morning because the military commissions have refused to take this court's decision in al-Nusayri seriously. There's the issue of the CMCR trying to circumvent this court's clear directions regarding remedy with the acknowledged error in Judge Waitz's application to be an immigration judge. But there's also the fact that the CMCR and the military commissions ignored the apparent conflicts that surrounded Matthew Blackwood, a senior member of the trial judiciary who was explicitly responsible for shaping judicial decisions. He presided over ex parte SIPA-like hearings with the prosecution without the military judge present. He used a judicial ruling as a writing sample secretly to the National Security Division, which represents the government here, and he traded on his position as a senior member in the trial judiciary to get a job with a component of the Department of Justice that is also part of a military commission's prosecution team. No member of the public would consider this to be a fair and impartial judiciary. To be clear, Matthew Blackwood was not a law clerk in the sense of a federal judicial law clerk. As I mentioned, he presided over these ex parte SIPA-like hearings under military commission rule of evidence 505. This is something that a magistrate or a special master would do. In multiple instances, the military judges did not even have access to the classified computer systems, so Matthew Blackwood was the only one who did. He was a GS-15 subject matter expert, which was the same rank as Waits and Rubin, and he, in fact, outranked Judge Libretto. The judges were part-time on the military commissions, maintaining an active court-martial docket, whereas Matthew Blackwood was the only senior member of the trial judiciary that was full-time assigned to the Hathi Commission, and he was, of course, long-term. He was there through multiple years as three judges came and went. He had a dynamic, innovative legal work that would play a major role in shaping case decisions. That's a quote from his job description at page 799 of the Joint Appendix. So the ethics rules that are limited to law clerks simply don't address what his role is. He also testified how important... Ms. Kelton, if you could then say what are the ethics rules that should apply to Mr. Blackwood? You're suggesting he's more like a magistrate or a special master. I mean, do you think the judicial ethics apply to Mr. Blackwood? Absolutely, Your Honor. First of all, the judicial ethics apply to every member of the modern judicial family. The fact that there are some carve-outs for other job searches just simply doesn't apply to Mr. Blackwood. The restrictions on how a magistrate would search for a job as their term comes to an end is far more applicable. And truly, what needed to happen is disclosure of his attempts to find a job with a party to the prosecution. And at that point, steps could be taken. Perhaps Mr. Altamir would have waived the apparent conflict, but the judges would have been able to then secure the integrity of the decisions coming out of their chambers. We are not suggesting that Judges Rubin or Libretto intentionally shaped rulings to help Matthew Blackwood. The real issue is how did he shape rulings in ways that the judges did not even know? Ms. Helm, just to pursue the same question, you're seeking mandameness, which means your relief, you must be clearly entitled, clearly and indisputably entitled to it. I've been unable to find any case in your briefs or anywhere else which says that a law clerk that simply applied for a job, as opposed to one who got an offer, has a disqualifying conflict. Am I right about that? Your Honor, I actually disagree with that, but again, he's not really a law clerk. So those cases are the closest analog that a lot of the federal case law would have, but the fact that those cases skew a little bit differently should not concern the court because in fact, the cases also say that there is a spectrum of behavior on a law clerk's job application. But you see, that's sort of just my point. That combined with the fact that the job he ultimately got was, it was with the U.S. Attorney's Office, right? It was. Yeah, which is different from the situation in Aldo Sherry. All of those combined, it's just, how do you make the case that you're clearly and indisputably entitled to this relief? It has to be, do you see my point? This is a mandamus, actually. Absolutely, Your Honor. So there can't be any doubt about the petitioner's entitlement to relief on this issue for us to be able to grant mandamus. And there is no doubt. First of all- I guess that's where I'm not yet convinced, I haven't seen that in the briefs. So the particular U.S. Attorney's Office where he got a job, during his interview, he interviewed with a member of the prosecution team prosecuting Mr. Al-Nashiri. During that interview, they discussed Mr. Blackwood's role as a senior member of the trial judiciary. And during his job application to the National Security Division, he secretly used a writing sample that was one of Judge Rubin's opinions. And that writing sample issued a ruling that excluded Mr. Al-Tamir from classified sessions of the military commission. So he was trading on his position. There's a spectrum of law clerk behavior, if we assume that law clerks are the correct analogy, that would raise issues. Whatever that line might be, Matthew Blackwood was so far on the other side of it, especially in light of the fact that he was presiding over these ex parte meetings with the prosecution. The Ninth Circuit's case in the First Arizona Bank is probably this court's closest case to look to. The thing is that most of the time, everyone does this right. And so there's no need to go back and look for exactly where these lines are. And that's why the rules are in place. We need objective rules so that there's no question here, there's whatever, whatever the line was, Mr. Blackwood had crossed it. And that is where our clear and indisputable right to relief comes from. Let me ask you a different, no, you go ahead. Okay. Um, if we, I mean, if we assume that Blackwood's disqualification, you know, did not also disqualify, you know, judges Rubin and Libretto. So the only possible disqualification is based on Judge Waits. I guess why isn't it an adequate remedy to allow reconsideration of Judge Waits's decisions as the CMCR is, you know, undertaking or has ordered to be undertaken? Why isn't that an adequate remedy here? At least to see how that process goes. For multiple reasons, Judge Rao. First of all, the government asked for reconsideration as a remedy in Al-Nashiri, and this court rejected it. Specifically, this court commented that it had to vacate the CMCR's rulings as well because it was unsure how Judge Spaff's rulings would have impacted it. Because ordinary appellate review after the fact cannot scrub the taint. Oh, but this isn't, but this, let me just interrupt because I think Judge Rao's point is this isn't, the alternative here isn't appellate review. The alternative here is de novo review of all of Judge Waits's orders. So it's a different problem. So that is still an inadequate remedy. But why? That's Judge Rao's question. Why? Sure. The reason is because Judge Waits's rulings that came at the very beginning of the case have shaped the entire litigation. For example... Ah, so your concern is, your concern is about the rulings post-Judge Waits, right? Certainly we are. So Judge Waits's rulings themselves... But what about his, what about, let's take this step at a time. What about for just his rulings? Wouldn't this be a perfectly adequate remedy to have a different judge de novo review every order you identify? Your Honor, it would not be adequate simply because we have seen that the CMCR and the military commissions have been unable to follow this court's clear direction. But truly all of... That's a different problem. I agree with that. That's a problem. But just focus on Judge Rao's precise question, which is why wouldn't de novo review of every order you identify, setting aside the question of post-Waits orders, just his, why wouldn't that be adequate? In fact, why is that any different than dissolving the commission? As a practical matter, if you void every ruling that Judge Waits made, it probably No, no, no, no, no, that's not the question. No, the question is petitioner here gets to identify every order he wants reconsidered de novo. There is no... What's the matter with that? And isn't that even better because you get to keep the ones you like? Your Honor, we certainly were offered that and rejected it because we saw it as an invitation to error. We don't know how even... But you haven't told us why. His later rulings were also informed by his earlier ones. No, but all of his rulings, all of his rulings will be reviewed de novo, Judge Waits' rulings. I don't have any doubt you're right, that his later rulings were influenced by his early rulings, but the offer here is to de novo all of them. It is impossible to extricate his rulings from the rest of the commission. We have... No, can I just, just not the rest of the commission. Let's assume a world in which he's the only one who's issued any rulings. And if we assume that world, so we're not talking about the spillover consequences for any other judge who might come along later. Let's just assume a world in which he's the only judge that's ever sat. In that universe, if the remedy is you get to pick any ruling you want that gets de novo reconsideration by somebody else now, why isn't that... It's equivalent to Al-Nashiri, except to the extent it's not, it's to your advantage because you get to preserve certain of his rulings. Otherwise, how is it any worse than what happened in Al-Nashiri? Judge Srinivasan, what these hypotheticals suggest is essentially vacating the entire proceedings. And it's a little hard to go to assume that the four years that followed Judge Waits didn't happen. I think all we're trying to do is isolate the source of the possible dispute here. And I just, as a predicate to that, I think it's helpful for all three of us if we just at least deal with the premise that if we're not talking about spillover consequences for rulings by the other judges, and we're only talking about what Judge Waits did, then that the remedy that's in effect now, which is that you get de novo reconsideration of any of those rulings that you choose, that's no worse than what happened in Al-Nashiri. If we found out about this error on the same day that Captain Waits retired and were able to get to this court at that very moment, then the remedy the CMCR proposed could be adequate. It does overlook all of the oral rulings. And of course, those rulings are also subject to vacator. Those rulings are also void. There are, of course, some... Yeah, I think they should. Is there a dispute about that? I would assume that a ruling, that it encompasses oral rulings too. Is it not the case right now that you can get de novo reconsideration of any oral ruling by Judge Waits? That is certainly not how it has appeared from how the CMCR phrased things or how Judge Libretto did, where we were supposed to provide a list of AE numbers that provided orders that we wanted reconsidered. But that particular remedy of reconsidering oral rulings, that's a very difficult bell to unring. There are rulings on voluntariness of our clients waiving an appearance to participate in a particular hearing. Once that has been ruled on orally, it's our position that everything that follows, of course, has to be void because assuming that our client had not voluntarily waived an appearance, there's an oral ruling and everything that follows simply has no further legitimacy. Assuming that the remedy that this court is trying to fashion is supposed to reinvigorate the integrity of the judicial system, parsing the potential, trying to draw the line that fine simply fails to do the sufficient reinvigoration necessary. And of course, it entirely overlooks how interconnected all of the rulings are. For example, Judge Waits, within a month of applying for his immigration judgeship, he entered a protective order that limited what unclassified information Mr. Altamir could share with pro bono experts. Within a couple of months of that, he issued a ruling that limited Mr. Altamir's access to witnesses. These, of course, shaped everything that happened after that point. All of the 505 substitutions, classified evidence shaped discovery litigation, including the deposition that just occurred. I see my time is up. Can I ask you one follow-up question just before we hear from Ms. Tarrant? Just assume for purposes of the question that I think that the remedy as to Judge Waits is functionally the same as the remedy as was at issue in Al-Nashiri, except that you get to identify certain orders that you actually don't want to have reconsidered. And then the question becomes, how would one deal with potential spillover consequences concerning the rulings by the judges who came along later? And is there a standard or some approach that you would suggest on identifying that corpus of orders that came along later that are sufficiently bound up in orders that Judge Waits issued? Your Honor, I believe that your question is an impossible task, and it also imposes an impossible burden on Mr. Altamir. It is essentially asking to impose an actual bias standard instead of an apparent bias standard. One of the things that the defense cannot do and should not be able to do is to point to precisely how the apparent bias impacted decisions. But we do know that Judge Waits' decisions impacted later ones. Every decision that he made on a substitution for classified evidence impacted investigations, impacted other motions, impacted other discovery litigation down the road. So there could be ways that a ruling even in favor of Mr. Altamir early in the case, but not a complete ruling in his favor, limited what our investigation was, limited what the discovery litigation. To parse it that finely, to read Al-Nashiri down to a nub, it would be an impossible task. And again, that is exactly why an objective rule with a brighter line is necessary. Suppose, just to pursue this a little bit, when you answered Judge Srinivasan's question, you said that that's to impose on Petitioner here an obligation to show actual bias. But suppose in answer to his question to you, suppose the standard was that a Petitioner, all Petitioner had to do was to show, I'm talking about the post-Waits orders now. And remember, this is mandamus. So the question is, is there an adequate alternative remedy? Suppose all he has to do is show, quote, like maybe a reasonable possibility that a later order was affected by an earlier order, an earlier Waits order, just a reasonable possibility. Not that it was infected, but just a reasonable possibility. Why, if the government, if the commission were willing to do that, how could we say that that is not an adequate remedy, at least at the moment? It might turn out not to be, but that could be reviewable. But at this point, why wouldn't that be enough? When you compare it to the alternative of dissolving the commission, which we said in Al-Nasheri was a draconian solution that we were trying to avoid. Sure. Judge Tatel, I have two different responses to your question. First is that the reviewer looking at those prior decisions has no way to actually know how the apparent bias impacted it. So it essentially would be turning a legal question into- Excuse me. I'm sorry to interrupt you. The question isn't whether the bias affected it. The question is whether the order that on de novo review has been reversed affected it. For example, suppose in the de novo reconsideration, the judge takes a look at a waits order that denied discovery and he reverses that. I'm going to grant discovery on that. That discovery motion should have been granted by waits. Now, it seems to me that it's pretty obvious that that decision is going to have affected later decisions because it means that petitioner would not have had the evidence from that discovery order in support of his later motions. So it's not that the later motion is affected by the bias. It's just that it's affected by the fact that the motion was denied. Do you see my point? I do, your honor. I think candidly that your honor's question proves the point that it's an impossible task. I see. And it's a difference. It is why a clearer rule is necessary. And also it is why we need to see that what has happened in the military commissions is a constant refusal to read this court's clear directions. Or they read vacate and they heard reconsider. Okay, let me ask you this. You said my answer showed that it was impossible. So I have an impossible question for you. Do you have any sense, and I realize you may not know the answer to this. Do you have any sense at all as to what effect waits orders might have had on later orders? Is there any way to quantify that at this point so that we understand what the risk is of choosing one option over another? Your honor, do you mean to quantify in the sense of how many orders they impacted? Yeah, like how much of the post waits decisions do you think are affected by what waits did? I can't give you a specific number. There's no way to know, right? Do you know how many post waits orders there are? Are there hundreds? There are hundreds. I mean, a certain number of those are motions to continue schedule. How many? Are there hundreds of substantive orders? There probably are. However, to set the court's mind at ease about the scope of litigation. Now, this is a big, it's a big request. This is the notion of voiding the proceedings from the time of Captain Waits' application. I fully understand that that is a big request. But that is a necessary request. And the fact that there has been a substantial amount of litigation, it still hasn't gotten to judgment. We are still in a better situation than this court having to vacate the verdict and redo everything, including a trial. In comparison to, for example, the 9-11 commission that has about 33,000 or 36,000 pages of pre-trial record, the Hathi commission has closer to about 3,300. There's more than that because there's some closed hearings that I don't have transcript page numbers for. A huge number of the actual days of hearings were short, an hour or less. There's also been delays in this court caused by Mr. Altamir's health. There's been delays because the government held him without charge for years. There are certain inefficiencies to what we are asking for, but they are far less than the inefficiency of having to redo this after verdicts. And I take it, so your position is, even though, as you say it, the vacated remedy that you're asking for is a fairly extreme one, that there's nothing short of that that is workable or acceptable? Nothing short is workable. And in between what is on the books now, which is de novo reconsideration of everything Judge Waits did and complete eradication of everything that's happened to date. There's nothing in the immediate. And even if, for example, if you take the proposition that Judge Tatel asked you to engage with, which is a sort of reasonable possibility standard, even if it was flipped so that it was incumbent upon the government to show why there's no reasonable possibility, as opposed to incumbent upon you to show why there is a reasonable possibility, that regime still, to you, is something that's unworkable. It is unworkable. And the reason is because of the timing of things. Now, in the Sherry, there was sort of an intermediate remedy because there were four that preceded Judge Spath's job application. So there was a clear delineation of untainted proceedings. Here, that simply doesn't exist. It was only the arraignment that happened and nothing else. So in order to basically have an equivalent remedy of everything vacated post-taint, it's actually the same remedy that we are asking for. And it's the reason why, in Lilleberg, that is the default remedy, that it simply is an impossible task to put Humpty Dumpty back together again. Okay. Thank you, Ms. Skelton. Well, unless my colleagues have further questions from you, we'll hear from Ms. Taran now. May I please the court? In response to your question, Judge Tatel, there are 149 substantive decisions of Judge Rubin and Judge Lobredo. And of those, petitioner is able to point to only one that was affected by a decision of Judge Waits. And that was the decision of Judge Waits denying the defense motion for an order that would prohibit female guards from touching him. And when Judge Rubin was presiding over in-court proceedings, he had ordered the petitioner to appear in person. And the petitioner violated that order, refusing to come to court by renewing his objection to being touched by female guards. And Judge Rubin explained that he was going to overrule that objection and not reconsider the decision of Judge Waits on the ground that petitioner did not have a legal right to dictate the gender of the guard force. But the CMCR explained that, to the extent petitioner is able to point to any order, including that order, that demonstrates that the decision of Judge Rubin or Judge Lobredo incorporated or otherwise relied upon a decision of Judge Waits, then the new military judge, Judge Zimmerman, must consider those decisions de novo as well. And so we think the CMCR- What does that exactly mean? Could you just take that a little deeper? Suppose, take my hypothetical that I asked Ms. Skelton about. Suppose they identify a Waits order denying a certain kind of discovery. Because there are a lot of discovery orders here, right? Yes. Yeah. Okay. So what would petitioner have to do in order to get de novo review of post-Waits orders? Just point to the decision of Judge Rubin or Judge Lobredo that either incorporated or relied upon that decision. And that could include even decisions that address ex parte motions. Well, suppose it didn't rely on it. But suppose they say, well, look, Judge Rubin ruled a certain way against us. But that was because Waits had denied us discovery. We needed to win that, to prevail on that order. Then we think the CMCR's remedy would require the new military judge to consider a new, any decisions that were affected by that discovery order. Okay, so let, this is very helpful. So see if I can articulate it, what petitioner would have to show. Petitioner would simply have to say, take my hypothetical. Petitioner would file, would list the Rubin orders that he believes are affected by the under the offer the commission has made here. Those orders that he identifies would be de novo reviewed. De novo reconsidered, right? Yes, your honor. But just based on his identifying it? Yeah. Or would there have to be an assessment of whether, because as I understand what Judge Tatel asked you, and sorry to interrupt, but as I understand what Judge Tatel asked you, it's that the other side identifies an order by Judge Rubin or Judge Libretto as having been affected by an order issued by Judge Waits. And you're saying once that identification is made, then the subsequent order is reviewed subject to de novo reconsideration? The CMCR indicated that the new military judge would consider. I think that under the CMCR's order, there would be an assessment by the military judge. About an assessment of what? Do you have the actual language there? Is there any actual language we have about the post Waits orders? Well, the CMCR explained that with respect to this example about the female guards motion, that that claim that petitioner raises that this decision of Judge Rubin was affected by Judge Waits' decision should be presented to the military judge. And then the military judge provides petitioner an adequate remedy, which we believe would include mandatory de novo reconsideration of that decision by the new military judge. So does that mean the standard for the petitioner is just that they have to show it was affected by Judge Waits' ruling? Is that the standard? Yes, Your Honor. But does that mean they have to show it was affected or just say it was affected? They reasonably believe it was affected. It's a big difference. We think that they would just have to show that. Well, it would just have to. Wait, you didn't answer my question. Your Honor, we think that they would just have to identify that order. Okay. That's what I was looking for. Okay. So that's very helpful. Okay. Um, and then if they identify that order, the new judge would reconsider it de novo. Yes, Your Honor. Yes, Your Honor. Okay. And even if you don't, just to push it a little bit further, they identify an order as having been affected by a prior order issued by Judge Waits. That's it. It's not that then you come in and say, wait a minute, they're wrong to say that order was affected by something Judge Waits did because there was no effect. Correct, Your Honor. Okay. I see. Okay. Thank you. Thank you. So with respect to the clerk, Mr. Blackwood, petitioner contends that Mr. Blackwood is more like a magistrate judge rather than a law clerk because he presided over ex parte meetings with prosecutors. But Judge Waits explained during voir dire that Mr. Blackwood was acting under Judge Waits's direction and supervision and was performing only administrative tasks during this ex parte meeting with the prosecutors. So, for example, Judge Waits explained that he had instructed Mr. Blackwood to meet with the prosecutors and to ask them whether they had obtained Judge Waits's guidance on proposed substitutions and summaries for classified information, whether they had taken those his guidance into account and when they would be providing to Judge Waits for his review and decision, those revised proposed summaries and substitutions. And then he instructed Mr. Blackwood to simply relay that information back to Judge Waits. And so Judge Waits explained that there was nothing inappropriate about this process and that he would have done it himself except for the fact that he was stationed in Italy, but that it was appropriate for Mr. Blackwood to do as a law clerk because he was performing simply administrative tasks. He was not making any judicial decisions. And in fact, as Judge Libretto explained during his voir dire, Mr. Blackwood was prohibited from making any judicial decisions in Petitioner's Military Commission case. And as each military judge who has presided over Petitioner's Military Commission case has explained either in voir dire or testimony or declaration before the Military Commission, although they relied on their law clerks, including Mr. Blackwood for assistance, they, in each instance, it was the military judge rather than the law clerks who were making the judicial decisions in Petitioner's Military Commission case. And so because Mr. Blackwood was simply a law clerk, the normal recusal rule that applies to law clerks applies here. And that is that law clerks must be screened from cases when they accept a position with the party that appears before the court, not when they apply. And here, Mr. Blackwood accepted only one position, and that was a position with the U.S. Attorney's Office from the Western District of Missouri. Ms. Tan, if we were to reject the analogy of Mr. Blackwood to a term law clerk, what would the standard then be for disqualification of Mr. Blackwood as a government attorney working on this case? The only two standards we're aware of is a judge and a law clerk. And so we think, though, that there's no sound reason to depart from the normal rule here, where Mr. Blackwood was not making any judicial decisions, but was only assisting the judges. The petitioner pointed out that one of the attorneys from the U.S. Attorney's Office from the Western District of Missouri agreed to serve as a taint attorney in the Sherry's Military Prosecution. Certain mental health issues arose at sentencing there, but that attorney, Mr. Jeff Valenti, explained in a sworn declaration that he has no involvement in the prosecution of petitioner's military commission case. And so because the employer and the party are not one in the same, no disqualifying conflict of interest arises as a result of his decision to accept that offer of employment. Unless there are any further questions, Your Honor, we respectfully request that this court deny the mandamus petition. Thank you, Ms. Tarrin. Ms. Skelton, we'll give you two minutes for rebuttal. Thank you, Your Honor. I'd like to- Ms. Skelton, could you- sorry, maybe the chief judge won't count this in your two minutes. No. Could you just tell us why what the commission has offered as described by Ms. Tarrin doesn't give you everything you want? Your Honor, what Ms. Tarrin described is not what either the commission or the CMCR has offered. But this is what- Yeah, go ahead. At page 94 of the joint appendix, this is in the CMCR's decision. The CMCR said that Mr. Altamir's argument about the continuing impact, invisible impact is speculative, and that the only one example related to the female guards, that that's the only one that the CMCR ordered any further review of at all. So what- Suppose we understand Ms. Tarrin is telling us what this means today. And suppose our opinion reflects that, what she said. That is, you get, petitioner gets de novo reconsideration of any post-waits order that he identifies as possibly being affected by the waits order. Why isn't that enough? It's not enough because it fails to account for a couple of things. It turns the question of taint into, and into basically a true false question of, was this prior ruling acceptable? No, no, no, no, no. First of all, this would only apply to a prior ruling that's reversed, right? So let's stick with my hypothetical about a discovery order. The new judge takes a look at a waits discovery order. It says it was affected by taint, and I'm going to grant that discovery. He gets that discovery. And you say, okay, that means that the following post-waits orders also need de novo review. And as I understand Ms. Tarrin's description of this remedy, that you get that. So first of all, the initial reconsideration becomes the true false question instead of an essay question. But then even assuming the one order that Judge Rubin ordered the forced cell extraction in January of 2017, that led to five spinal surgeries, which led to a host of questions about Mr. Altemir's competence and ability to participate both mentally and physically. So that one ruling, candidly, voids the rest of everything that happened. Isn't that ruling getting reconsidered? In other words, if the new judge decides that that ruling was wrong, isn't that part of the de novo reconsideration? So it only gets reconsidered if Judge Waits' ruling gets overturned. But even if Judge Waits' ruling doesn't get overturned, then his ruling still had an impact on later rulings. So this is really an attempt to parse things so finely that it eliminates the ability of any court to rehabilitate the public perception of justice. The prophylactic remedy that this court considered in al-Nashiri, it stands even stronger here. We see that al-Nashiri was not a case of one bad actor. We have seen the CMCR and the Military Commission eager to read it down to a nub. And trying to parse finally how exactly to implement the most limited possible remedy shows the impossible task of trying to scrub taint from a proceeding. When the taint arose at the beginning of the proceeding, simply the proceedings must be scrubbed themselves. I probably should have asked Ms. Tarrin this question, but has the Military Commission, have they made it clear to these judges that they can't be looking for jobs while they're sitting on these cases? The record that we have right now, Your Honor, is that they have affirmatively not fixed this problem. Matthew Blackwood testified about this. Judge Libretto commented on this in Bois d'Ire that there has been no change in any ethical guidance that the trial judiciary has given. And in fact, Matthew Blackwood testified that he was aware of the issues percolating in the National Security Division and other components of the Department of Justice, and it did not impact his behavior. Unless my colleagues have any further questions, we'll bring this one to a close. Thank you, Ms. Skelton. Thank you, Ms. Tarrin. We'll take this case under submission.
judges: Srinivasan, Tatel, Rao